UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

RILEY PRESCOTT,

      Plaintiff,                            Case No. 24-cv-

-vs-

                                           Hon.

BLUE WATER GRILL
MANAGEMENT CO., LLC,

      Defendant.

---

Jennifer Lossia McManus (P65976)
Fᴀɢᴀɴ McMᴀɴᴜs, P.C.
Attorneys for Plaintiff
25892 Woodward Avenue
Royal Oak, MI  48067-0910
(248) 542-6300
jmcmanus@faganlawpc.com

---

## COMPLAINT AND JURY DEMAND

There is no other pending or resolved civil action
arising out of the transaction or occurrence
alleged in the Complaint.

    NOW COMES Plaintiff, Riley Prescott, by and through her attorneys, Fᴀɢᴀɴ McMᴀɴᴜs, P.C., and for her cause of action against the Defendant, states as follows:

## JURSIDCTIONAL ALLEGATIONS

    1.    Plaintiff, RILEY PRESCOTT (hereinafter referred to as "Prescott" or "Plaintiff"), is an individual residing in the City of Rockford, County of Kent, State of Michigan.

    2.    Defendant, BLUE WATER GRILL MANAGEMENT CO., LLC (hereinafter referred to as "BWGM" or "Defendant") is a domestic LLC organized under the law of the State of Michigan, and at all times pertinent hereto operated in the City of Grand Rapids,

County of Kent, State of Michigan.

3.      Defendant BWGM is part of the Gilmore Collection, which includes eleven restaurants and hospitality venues in West Michigan and Colorado.

4.      Defendant BWGM operates the Blue Water Restaurant ("Blue Water") in Grand Rapids, Michigan.

5.      At all times pertinent hereto, Plaintiff worked at Defendant's Blue Water Restaurant located in Grand Rapids, Michigan.

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. §1367 (supplemental).

7.      The amount in controversy is in excess of $75,000.00, exclusive of all interest, costs, attorney fees and punitive damages.

## GENERAL ALLEGATIONS

8.      Prescott began working for Blue Water as a part time dishwasher in June 2021.

9.      Prescott was sixteen years old at the time of her hire and was to work part-time while attending school as a student.

10.     Shortly after commencing her employment with Blue Water, Prescott was subjected to rape, severe and persistent sexual assault and harassment, and other horrific conduct by at least four male employees who were in their 20s and 30s.

11.     Blue Water's employees regularly provided Prescott with drugs and alcohol, both during and after hours, on company property, after which she was raped on multiple occasions, also on company property.

12.     Prescott was hired to work at Blue Water after interviewing with an

executive chef, "Clark."

13.    Shortly after her hire, Clark started a new job, and no longer worked at Blue Water.

14.    As a "back of the house" restaurant employee, Prescott reported to the two top chefs, "Wes" and Luis Arredondo.

15.    While Wes occasionally provided Prescott with her work schedule, he was not generally present at Blue Water because he was also the Top Chef at another Blue Water restaurant, Bostwick Lake Inn.

16.    Instead, Arredondo functioned as the head chef of Blue Water and spent significantly more time in the kitchen actively cooking and managing employees than Wes.

17.    Prescott reported directly to Arredondo.

18.    Arredondo exercised control over the terms and conditions of Prescott's employment.

19.    Arredondo provided Prescott with her weekly work schedules.

20.    Arredondo disciplined employees and participated in their disciplinary meetings.

21.    Arredondo wrote disciplinary memos to employees' files.

22.    Arredondo hired employees.

23.    Arredondo participated in termination meetings.

24.    Arredondo notified employees of their raises.

25.    Arredondo regularly gave Prescott shots of liquor that were maintained in the back of the restaurant for employee consumption.

26.    During Prescott's employment with Blue Water, drug and alcohol use among both minors and adults was rampant, and many of the employees were "on something" throughout their shifts.

27.    Garrett, another Blue Water chef, supplied drugs to other Blue Water employees, typically marijuana and cocaine, that he bought from a chef named Albert.

28.    In addition, other employees provided each other with homemade marijuana edibles.

29.    Blue Water's front of the house personnel routinely partook in the drug and alcohol consumption with the back of the house personnel after work and on breaks during work hours.

30.    Blue Water management was aware of the rampant drug use and often sent emails to the staff about drinking during working hours, but never directed the emails at any specific employees or took any meaningful steps to end it.

31.    The emails essentially were meant to provide a cover that Blue Water "addressed" the underage drug and alcohol use without actually attempting to end it.

32.    In the Spring of 2022, Arredondo's brother, Jose, sexually assaulted Prescott while in the Blue Water parking lot.

33.    Jose pushed her up against his car, shoved his hands under her skirt and digitally raped her.

34.    Prescott tried to get away and return to her car, but Arredondo ran after her with his pants down.

35.    Prescott made it into her car and left.

36.    Prescott told two other chefs, named Ryan and Garret (who now works at

another Gilmore business, Bostwick Lake Inn), at work about the incident and they said that it was her issue to deal with.

37.    After this incident, Arredondo apologized to Prescott.

38.    However, Jose never talked to her again and instead made fun of Prescott to other employees.

39.    Approximately one month later, Arredondo raped Prescott in his car in the parking lot of Bluewater after feeding her a steady supply of drugs and alcohol.

40.    Weeks later, Arredondo again raped Prescott in his car after giving her a steady supply of drinks while they were both standing outside and in his car in Blue Water's parking lot until Prescott was nearly blacked out, after which he raped her.

41.    Prescott told another Blue Water chef, JR, about the rapes.

42.    In response, JR told her that her rapists should be in jail.

43.    Horrifically, however, rather than reporting the conduct to management, JR then plied her with alcohol and raped her as well.

44.    More specifically, while many of the Blue Water employees were drinking at The Score across the street, JR offered to give Ms. Prescott a ride home because he knew she was drunk and couldn't drive. While driving her home, he pulled over and raped her in his car.

45.    Prescott never spoke to him again, but JR would routinely try to talk to her at the restaurant.  Other workers at the restaurant knew about this incident and knew that she was avoiding him.

46.    After being raped by JR, Prescott was again raped by Arredondo in his car after supplying her with drugs and alcohol.

47.    Between the rapes, Arredondo regularly hit Prescott's behind while everyone was working and made sexual comments to her that others saw and heard.

48.    In addition, throughout this time Arredondo raped Prescott multiple times behind Blue Water's dumpster during work hours after providing her with multiple alcoholic drinks.

49.    While employed with Blue Water, Arredondo informed Prescott that she had received a raise in her pay, and asked her, "how are you going to pay me back?"

50.    Arredondo's informing Plaintiff of her raise, and asking how he would be "paid back," indicated an expectation that Plaintiff's submission to the unwelcome sexual advances was an express or implied condition of receiving job benefits.

51.    Given the number of Blue Water employees who sexually assaulted and/or raped Plaintiff, the fact that one of those employees was Plaintiff's supervisor who operated in a management role, and the fact that Arredondo regularly hit Plaintiff's behind and made sexual comments to Plaintiff in front of other employees, Blue Water had actual notice of the sexual harassment/assault that Plaintiff was subjected to.

52.    In the alternative, given the totality of the circumstances discussed above, Blue Water had constructive notice that there was a substantial probability that Plaintiff was being sexually harassed while at work.

53.    In October 2022, a video was taken and shared on social media of Blue Water employees drinking alcohol at a restaurant/bar called The Score after work.

54.    Prescott was seen drinking in the video.

55.    Shortly after, Prescott was called into a disciplinary meeting with another Blue Water manager, Carolyn Benedict, and Arredondo, during which Benedict yelled at

Prescott that she was not allowed to drink and threatened to terminate her employment.

56.    Prescott asked whether the people who gave her the drinks were talked to, reprimanded and threatened with termination as well, and Benedict said no.

57.    During the meeting, Arredondo convinced Benedict not to terminate Prescott's employment, telling Benedict that "we need her."

58.    Benedict concurred and Ms. Prescott's employment was not terminated.

59.    However, an undated disciplinary memo signed by Arredondo and Benedict was placed in Prescott's personnel file.

60.    Directly after that meeting, Prescott went home and broke down. She self-harmed by cutting her wrists. The next day she checked herself into Pine Rest where she underwent treatment for five days.

61.    Prior to checking herself in to Pine Rest, Prescott called Blue Water to let them know that she would not be showing up for her shifts (Ms. Prescott was not going to have her phone at Pine Rest).

62.    When Prescott's mother picked her up from Pine Rest, she drove straight to Blue Water where she informed Arredondo and other managers that she was terminating her employment, which of course had already been constructively terminated.

63.    When Prescott informed Arredondo and other managers that she would not be returning, the response was "we figured."

64.    On or about July 5, 2023, Prescott filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge Number 471-2023-04779, alleging that she was sexually harassed, assaulted and/or subjected to a hostile work environment, and constructively discharged from her employment based upon her

gender, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

65.    On November 1, 2023, the EEOC issued a Notice of Right to Sue on Prescott's Charge of Discrimination.

## COUNT I
## VIOLATION OF TITLE VII

66.    Plaintiff incorporates all above paragraphs as if specifically repeated herein.

67.    At all relevant times herein, Defendant is an employer and Plaintiff is an employee within the meaning of Title VII, 42 U.S.C. § 2000e-2(a).

68.    Title VII prohibits, among other things, discrimination because of gender and/or sex, sexual harassment, and subjecting an employee to a hostile work environment based upon sexual harassment.

69.    Notwithstanding the duties owed to Plaintiff pursuant to Title VII, Plaintiff was discriminated against based upon her gender, subjected to quid pro quo sexual harassment by Arredondo, and subjected to a hostile work environment, where Plaintiff's manager, Arredondo, raped her multiple times, and also where Plaintiff's manager, Arredondo, knew about the sexual harassment and assault that Plaintiff was subjected to by other Blue Water employees yet took no disciplinary action against them, thereby allowing such conduct to continue.

70.    Further, notwithstanding the duties owed to Plaintiff pursuant to Title VII, Plaintiff was regularly subjected to unwelcomed sexual advances, unwelcomed touching and/or verbal and physical conduct of a sexual nature by both her manager, Arredondo, another other co-workers.

71.    Arredondo's and others' harassment of Plaintiff was based on Plaintiff's

gender and/or sex (female).

72.     Arredondo's and others' sexual harassment of Plaintiff was sufficiently severe and pervasive to alter the conditions of employment and create an intimidating, hostile, or abusive working environment for Plaintiff.

73.     The environment in which Plaintiff worked was both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that Plaintiff did in fact perceive to be so.

74.     Given the number of Blue Water employees who sexually assaulted and/or raped Plaintiff, the fact that one of those employees was Plaintiff's supervisor who operated in a management role, and the fact that Arredondo regularly hit Plaintiff's behind and made sexual comments to Plaintiff in front of other employees, Blue Water had actual notice of the sexual harassment/assault that Plaintiff was subjected to.

75.     In the alternative, given the totality of the circumstances discussed above, Blue Water had constructive notice that there was a substantial probability that Plaintiff was being sexually harassed while at work.

76.     In addition, despite prior notice, Defendant failed to take appropriate remedial action regarding such sexually harassing and assaultive conduct, and instead continued to allow Plaintiff to work among her assailants without any safeguards in place to protect her from future and continued sexual harassment and assault.

77.     Based on the frequency and severity of the verbal harassment and physical assaultive conduct to Plaintiff, the humiliating nature of Arredondo's and others' conduct to Plaintiff, and the level of interference of Arredondo's and others' conduct with Plaintiff's employment, it is objectively reasonable that the gender and/or sex discrimination and

the sexually harassing conduct created a hostile work environment.

78.    Defendant violated Title VII, created a hostile work environment, and supported a hostile work environment when Defendant failed to take prompt remedial action to ensure Plaintiff would be safe from future sexual aggression, advances, physical contact and/or harassment, and otherwise failed to prevent sexual harassment.

79.    Based on the frequency and severity of the verbal harassment and physical assaultive conduct to Plaintiff, the humiliating nature of Arredondo's and others' conduct to Plaintiff, and the level of interference of Arredondo's and others' conduct with Plaintiff's employment, Plaintiff was constructively discharged from her employment with Blue Water, as the conditions within she worked were objectively intolerable.

80.    As a direct and proximate result of the gender discrimination, sexual harassment and hostile work environment, Plaintiff has suffered and will in the future suffer damages including, but not limited to:

a.    Loss of wages and earning potential, as it is unlikely that Defendant will promote Plaintiff or give her raises;

b.    Loss of promotional opportunities;

c.    Loss of professional esteem and consequent damage to Plaintiff's professional career;

d.    Extreme embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

e.    Exemplary damages;

f.    Other damages to be determined.

81.    The above-referenced discriminatory conduct by Defendant toward Plaintiff was malicious and/or engaged in with reckless indifference to Plaintiff's federally

protected civil rights and, as a result, Plaintiff is entitled to punitive damages.

82.    Plaintiff also seeks equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff requests that a Judgment be entered against Defendant, in whatever amount the Court determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, punitive damages and attorney fees.  Plaintiff also seeks equitable relief including back-pay, front-pay, or other equitable relief the Court deems appropriate.

## COUNT II
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

83.    Plaintiff incorporates the above paragraphs as if specifically repeated herein.

84.    At all relevant times herein, Defendant is an employer, and Plaintiff is an employee, within the meaning of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* (hereinafter referred to as the "ELCRA").

85.    The ELCRA states, in relevant part, "(i) Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions: […] (*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment…" M.C.L. § 37.2103(i)-(*iii*).

86.    Notwithstanding the duties owed to Plaintiff pursuant to the ELCRA, Plaintiff was discriminated against based upon her gender, subjected to quid pro quo sexual harassment by Arredondo, and subjected to a hostile work environment, where Plaintiff's

manager, Arredondo, raped her multiple times, and also where Plaintiff's manager, Arredondo, knew about the sexual harassment and assault that Plaintiff was subjected to by other Blue Water employees yet took no disciplinary action against them, thereby allowing such conduct to continue.

87.     Further, notwithstanding the duties owed to Plaintiff pursuant to the ELCRA, Plaintiff was regularly subjected to unwelcomed sexual advances, unwelcomed touching and/or verbal and physical conduct of a sexual nature by both her manager, Arredondo, another other co-workers.

88.     Arredondo made it clear to Plaintiff that her submission to his sexual harassment and assault of her was a term or condition of her employment.

89.     Arredondo's and others' harassment of Plaintiff was based on Plaintiff's gender and/or sex (female).

90.     The environment in which Plaintiff worked was both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that Plaintiff did in fact perceive to be so.

91.     Arredondo's and others' sexual harassment of Plaintiff was sufficiently severe and pervasive to alter the conditions of employment and create an intimidating, hostile, or abusive working environment for Plaintiff.

92.     Given the number of Blue Water employees who sexually assaulted and/or raped Plaintiff, the fact that one of those employees was Plaintiff's supervisor who operated in a management role, and the fact that Arredondo regularly hit Plaintiff's behind and made sexual comments to Plaintiff in front of other employees, Blue Water had actual notice of the sexual harassment/assault that Plaintiff was subjected to.

93.    In the alternative, given the totality of the circumstances discussed above, Blue Water had constructive notice that there was a substantial probability that Plaintiff was being sexually harassed while at work.

94.    In addition, despite prior notice, Defendant failed to take appropriate remedial action regarding such sexually harassing and assaultive conduct, and instead continued to allow Plaintiff to work among her assailants without any safeguards in place to protect her from future and continued sexual harassment and assault.

95.    Based on the frequency and severity of the verbal harassment and physical assaultive conduct to Plaintiff, the humiliating nature of Arredondo's and others' conduct to Plaintiff, and the level of interference of Arredondo's and others' conduct with Plaintiff's employment, it is objectively reasonable that the gender and/or sex discrimination and the sexually harassing conduct created a hostile work environment.

96.    Defendant violated the ELCRA, created a hostile work environment, and supported a hostile work environment when Defendant failed to take prompt remedial action to ensure Plaintiff would be safe from future sexual aggression, advances, physical contact and/or harassment, and otherwise failed to prevent sexual harassment.

97.    Based on the frequency and severity of the verbal harassment and physical assaultive conduct to Plaintiff, the humiliating nature of Arredondo's and others' conduct to Plaintiff, and the level of interference of Arredondo's and others' conduct with Plaintiff's employment, Plaintiff was constructively discharged from her employment with Blue Water, as the conditions within she worked were objectively intolerable.

98.    As a direct and proximate result of the gender discrimination, sexual harassment and hostile work environment, Plaintiff has suffered and will in the future

suffer damages including, but not limited to:

     a.    Loss of wages and earning potential, as it is unlikely that Defendant will promote Plaintiff or give her raises;

     b.    Loss of promotional opportunities;

     c.    Loss of professional esteem and consequent damage to Plaintiff's professional career;

     d.    Embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

     e.    Exemplary damages;

     f.    Other damages to be determined.

99.    Plaintiff also seeks equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff requests that a Judgment be entered against Defendant, in whatever amount the Court determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, punitive damages and attorney fees.  Plaintiff also seeks equitable relief including back-pay, front-pay, or other equitable relief the Court deems appropriate.

100.    As a direct and proximate result of the gender discrimination, sexual harassment and hostile work environment, Plaintiff has suffered and will in the future suffer damages including, but not limited to:

     a.    Loss of wages and earning potential, as it is unlikely that Defendant will promote Plaintiff or give her raises;

     b.    Loss of promotional opportunities;

     c.    Loss of professional esteem and consequent damage to Plaintiff's professional career;

     d.    Embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

e.      Exemplary damages;

f.      Other damages to be determined.

101.    Plaintiff also seeks equitable relief that the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against the Defendant in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, court costs, and attorney fees. Plaintiff also seeks appropriate equitable relief under the statute.

## COUNT III
## SEXUAL ASSAULT/BATTERY

102.    Plaintiff incorporates the above paragraphs as if specifically repeated herein.

103.    Defendant, by its agent Arredondo, subjected Plaintiff to unwelcome touching of a sexual nature.

104.    Arredondo's actions were intentional and willful, and engaged in with malice or with reckless indifference to the rights and sensibilities of Plaintiff.

105.    As a direct and proximate cause of those and the above enumerated actions, the terms, conditions and privileges of Plaintiff's employment were adversely affected and she was forced off of work on a medical leave.

106.    As a direct and proximate cause of those and the above enumerated actions, the terms, conditions and privileges of Plaintiff's employment were adversely affected and she was constructively discharged from her employment.

107.    As a direct and proximate result of the Defendant's wrongful and illegal

treatment of Plaintiff, Plaintiff has suffered injuries and damages, including, but not limited to, loss of past, present and future earnings and earning capacity; loss of the value of fringe and pension benefits; mental and emotional distress, including anxiety and mental anguish; humiliation and embarrassment; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue gainful occupation of choice.

108.    As a direct and proximate result of the sexual assault/battery by Defendant's agent, Plaintiff has suffered and will in the future suffer damages including, but not limited to:

       a.    Loss of wages and earning potential, as it is unlikely that Defendant will promote Plaintiff or give her raises;

       b.    Loss of promotional opportunities;

       c.    Loss of professional esteem and consequent damage to Plaintiff's professional career;

       d.    Extreme embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

       e.    Exemplary damages;

       f.    Other damages to be determined.

109.    The above-referenced discriminatory conduct were malicious, willful and/or engaged in with reckless indifference to Plaintiff's rights and, as a result, Plaintiff is entitled to punitive damages.

110.    Plaintiff also seeks equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff requests that a Judgment be entered against Defendant, in whatever amount the Court determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, punitive damages and

attorney fees.  Plaintiff also seeks equitable relief including back-pay, front-pay, or other equitable relief the Court deems appropriate.

Respectfully submitted,

FAGAN MCMANUS, P.C.

By: /s/ Jennifer L. McManus
      Jennifer L. McManus  (P65976)
      Attorney for Plaintiff
      25892 Woodward Avenue
      Royal Oak, MI  48067-0910
      (248) 542-6300
Dated:  January 8, 2024      jmcmanus@faganlawpc.com

## <u>PLAINTIFF'S DEMAND FOR JURY TRIAL</u>

NOW COMES the above-named Plaintiff, by and through her attorneys, FAGAN MCMANUS, P.C., and hereby demands trial by jury in the above matter.

Respectfully submitted,

FAGAN MCMANUS, P.C.

By: /s/ Jennifer L. McManus
      Jennifer L. McManus  (P65976)
      Attorney for Plaintiff
      25892 Woodward Avenue
      Royal Oak, MI  48067-0910
      (248) 542-6300
Dated:  January 8, 2024      jmcmanus@faganlawpc.com